LEE, Justice,
for the Court.
Sooner Federal Savings and Loan Association of Tulsa, Oklahoma [Sooner] appeals from a decree of the Chancery Court of the First Judicial District of Hinds County, Honorable James Arden Barnett presiding, which ordered reformation of a written agreement between Sooner and Depositors Savings Association [Depositors], successor to Bankers Trust Savings & Loan Association [Bankers Trust], a Mississippi corporation, and entered judgment in the sum of twenty-nine thousand two hundred fifty-nine dollars fifty-two cents ($29,259.52) in favor of Depositors.
The question on appeal is whether or not the lower court erred in holding that there was a mutual mistake between the parties to the agreement and in reforming the agreement.
In January, 1974, Sooner loaned three million dollars ($3,000,000) to Bankers Trust, which agreed to repay the loan with interest at the rate of nine percent (9%) per annum in monthly installments. The loan was to be secured by the assignment of an undivided fifty percent (50%) interest in certain mobile home loans held by Bankers Trust.
Bankers Trust sustained financial setbacks and, in about June, 1976, Sooner learned of Bankers Trust’s financial crisis and sent Charles Stidham and Michael Ward, officials in its organization, to Jackson, Mississippi, who attempted to work out *1126 Sooner’s loan. The principal balance on said loan at that time was two million three hundred fifteen thousand dollars ($2,315,-000). Sooner discovered that, contrary to the provisions of its loan agreement, Bankers Trust had failed to perfect Sooner’s security interest in the mobile home loans and Sooner was in the position of an unsecured creditor of Bankers Trust, which was then in the hands of receiver Robert Warren.
The parties began to negotiate on the basis that Bankers Trust would assign unto Sooner certain specified mobile home loans and Sooner would release Bankers Trust of all liability under the original $3,000,000 loan. Bankers Trust took the position that, because of its bad financial condition, it could not afford to accept a book loss and insisted that the value of loans assigned, as shown on its books, would be no more than the amount of its book liability to Sooner. Mr. Warren instructed the employees of Bankers Trust that they could take no more losses.
Sooner’s position in the negotiations was that it would settle for the $2,315,000, being the balance on said loan, by cash payment, which, of course, Bankers Trust was unable to pay. Bankers Trust submitted to Sooner a computer printout describing the loans which it proposed to assign. Stidham and Ward took the computer printout to their motel room and inspected same on the night of July 6, 1976. The loans had a total balance due of two million eight hundred ninety-two thousand dollars ($2,892,000). Based on that figure, they estimated that the loans would yield six and six-tenths percent (6.6%) interest income per year rather than the 9% Bankers Trust had agreed to pay, and that Sooner would suffer a loss on the original loan contract in excess of fifty-five thousand dollars ($55,-000) per year.
On July 7, 1976, Stidham telephoned the home office of Sooner in Tulsa and submitted the choices (1) take $55,000 per year loss in income or face the hazards of long litigation and the possibility that Bankers Trust might not survive its financial crisis, or (2) attempt to get assignment of additional loans which would bring the yield up to the agreed 9% figure. Its Tulsa office instructed Stidham to attempt to get more loans, but, if Bankers Trust refused, then Stidham was instructed to accept the offer submitted on July 6, 1976.
On the morning of July 8, Stidham approached Eldredge Boyd, a senior vice president of Bankers Trust, and requested that Bankers Trust add more loans to the package in order to increase the agreed percentage rate of 9%. Boyd refused, stating that Bankers Trust would take a loss on its books, and Sooner could “take it or leave it.” Stidham, acting for Sooner, agreed to the compromise. The final document was agreed upon and was typed up and styled “Compromise Agreement.” According to its terms, Bankers Trust was released from its $2,315,000 liability and, in consideration therefor, assigned to Sooner loans for a balance due of approximately $2,892,000. The loans assigned were to be specifically described in an instrument marked Exhibit “A” to the agreement. Mr. Warren executed the contract, leaving blank the space in Paragraph 6(c) for the entry of the total of the unpaid balance of the loans.
Stidham and Ward went to the Bankers Trust offices where the employees had started boxing up the loans for delivery to Sooner, and they used the first computer run to check off the loans to make sure that the files described thereon were packaged. About mid-afternoon, Donald Pate, accountant for Bankers Trust, arrived with a different computer run, and announced that such computer run was a final list of the loans to be assigned to Sooner. Stidham and Ward tallied the unpaid balances of the loans in the new computer run and found that the total was approximately twenty-five thousand dollars ($25,000) less than the unpaid balance of the loans list agreed to that morning. They brought the shortage to Pate’s attention and Pate stated that Sooner could not have any more loans than those set forth in the new computer run, which indicated the book value of the loan liability did not exceed the book value of *1127 those loans and they were under instructions not to take any losses.
Eldredge Boyd came in and the problem was explained to him. He asked Pate, “Is the unpaid balance [of the loans on the new computer sheet] less than it was this morning?” When Pate told him that it was, Boyd overruled Pate and said, “Add some loans to the package to bring it up.” The Bankers Trust employees delivered three (3) more loan files to Sooner, and after those loans were added to the list, Stidham inserted the sum of two million eight hundred ninety thousand eight hundred fifty-six dollars ninety-six cents ($2,890,856.96) in the space left for the total in Paragraph 6(c) of the compromise agreement. This was done with the approval of the Bankers Trust officials. He then executed the instrument on behalf of Sooner, Boyd and he initialed all exhibits to the agreement, Stidham and Ward then packed up the loans and returned to Tulsa with them.
Bankers Trust subsequently wrote Sooner that the book value of the loans assigned exceeded the book liability of.the debt to Sooner by approximately twenty-nine thousand dollars ($29,000) and Stidham replied that there may have been an excess book value settlement, but that Sooner had given up its right to the 9% yield and other valuable considerations and Sooner would not make any adjustment.
Stidham testified on the trial as follows, when Pate presented the new computer run:
“A. I stopped the whole process right then. I said, ‘Hold it. We are not going to accept this. This run is less than the offer that you made us this morning.’ And Donnie Pate and I got into an argument over it. Donnie was saying things like, ‘We have got to use this, because this is the book value of the Bankers Trust loans, and we are under an instruction not to take any losses.’ And I am saying, T don’t care. That is $25,000 less money owed from the customers than what you offered us this morning when you said take it or leave it.’ So Eldredge Boyd was in there, and he came over and said, ‘What is the trouble?’ I explained it to him. He thought about it awhile, and he said, ‘Add some loans to the package.’ He said words to this effect, paraphrasing, he said, he asked Donnie, he said, ‘Is the unpaid balance less than it was this morning?’ and Donnie said, ‘Yes, it is.’ And he said, ‘Add some loans to the package to bring it up.’ And Bankers—
Q. Bring it up to what?
A. To bring it back up to what we had this morning.
Q. As a result of Mr. Boyd’s instructions to the Bankers Trust staff, were any loans added to the package?
A. Yes, they were.
Q. What loans were those?
A. They are the loans that are noted on the bottom of Page — I think 35 of whatever this exhibit is, the attachment to the contract. Loan No. 173237,176941,190579. Those three loans were added.
Q. Which are written in handwriting?
A. That is right. They are written. Those three loans added up to $23,-799.14.
Q. What did those three loans add up to?
A. $23,799.14.
Q. That is the unpaid balance of those three loans?
A. Unpaid balance of the loans plus the unpaid balance of the insurance loans on the other loans applicable to them.
Q. And when they added those loans, what did it bring the total amount to, the total unpaid balance ?
A. It brought it up to $2,890,856.96.” (Emphasis added)
Donald Pate, Bankers Trust accountant, testified:
“A. As we said earlier, ‘Take it or leave it.’ And they decided to take it.
*1128 Q. And those were the loans that are described in Exhibit A, this computer printout?
A. That is correct?
Q. And there is no question but what those were the loans that Sooner got?
•A. In my mind there is no question. The loans on this printout are the ones Sooner got, right.
Q. And that was the deal you all made?
A. That is correct. (Emphasis added)
Paragraph 6(c), which is crucial to the contract, is in the following words:
“6. Bankers Trust represents and warrants to Sooner as follows:

c. That the information concerning the loans so assigned is true and correct as reflected on Exhibit “A” attached and the total unpaid balance of said loans is $2.890.856.96.”
In his written opinion, the chancellor stated:
“That there is a genuine controversy between the parties is without question. The Court can certainly understand that. I am not sure I understand all of it, but I understand at least that there is a controversy without question. .

I would just simply say this. As I heard each of the witnesses, I believed every one of them. As I heard one side, I believed them. As I heard the other side, I believed them. I think we are dealing with a situation where the parties genuinely approached in full and open and frank attempt to settle it, and there was a genuine misunderstanding. They were not talking the same language all the way through. I have vacillated back and forth so many times I feel like a zebra. But I do appreciate it. Thank you, gentlemen.”
In J. J. Newman Lumber Co. v. Robbins, 203 Miss. 304, 34 So.2d 196 (1948), the Court said in reversing a decree of the chancellor which reformed a contract:
“[Bjeeause the rule as stated approaches so nearly an intrusion upon the salutary rule that when parties have reduced their agreement to writing, the writing may not be varied by parol, it is required that the proof to sustain a bill to reform must be such as to establish the essential allegations beyond a reasonable doubt. .
This sends us to a close and critical examination of the record of the evidence. Two witnesses only were offered, the complainant in his own behalf, and for the defendant, the agent or scrivener who prepared the instrument. It is perfectly plain that the agent and scrivener prepared the instrument exactly as he intended it should be and that it expressed what he intended therein to express. There is, therefore, no case of a mutual mistake . . . .” 203 Miss, at 309-310, 34 So.2d at 197.
In Progressive Bank v. McGehee, 142 Miss. 655, 107 So. 876 (1926), the Court said:
“The evidence to support the decree of the Chancellor is not strong. On the contrary, the evidence to support the position of the appellant is very strong. We do not think it would answer any useful purpose to go into the evidence pro and con in detail. It is sufficient to say that there was a conflict. In Harrington v. Harrington, 2 How. 701, 718, Judge Sharkey said for the court:
‘The proof should be clear beyond a doubt, because, * * * it is better that a doubtful written instrument should stand, than that a doubtful provision should be substituted by parol testimony. * * * We cannot, on the mere ground of probability, reform written instruments for mistakes.’ ” 142 Miss, at 659, 107 So. at 876-877.
The principle of law stated has been affirmed in Perrien v. Mapp, 374 So.2d 794 (Miss.1979), and in numerous other cases.
There were intense negotiations by representatives of the parties in arriving at a compromise agreement of their differences. As stated, if Bankers Trust had been able to *1129 pay Sooner its principal balance of $2,315,-000, the matter would have been concluded and Stidham would have been glad to take that amount and go back to Tulsa. However, since that was an impossibility, he tried to recoup as much of the 9% due Sooner under the original contract as he could, but was only able to get loans which produced 6.6%. Although Robert Warren had instructed officials at Bankers Trust not to settle for a greater liability on the loans than the book value, the book liability of the loans listed for assignment to Sooner did exceed the book value. Stidham was not satisfied with the 6.6% income, but when Eldredge Boyd told him that was the best Bankers Trust would do and he could take it or leave it, Stidham accepted that compromise.
The evidence indicates that there was no mistake on the part of Stidham and Sooner, and that they knew exactly what they were agreeing to. The evidence also reflects that the Bankers Trust officials were aware of the situation as to book value and book liability of the loans assigned to Sooner, they were not taken advantage of, no fraud or misrepresentation was practiced upon them, and, even if those officials made a mistake, either in violation of instructions, or in their thinking at the time, there was no mutual mistake.
Therefore, the chancellor manifestly erred in finding that there was a mutual mistake in the preparation and execution of the compromise agreement and in entering judgment for Depositors. The judgment of the lower court is reversed and judgment is rendered here for appellant.
REVERSED AND RENDERED.
PATTERSON, C. J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, BOWLING and COFER, JJ., concur.